It will call the matter of Colleen Bradley v. West Chester University, et al. Mr. Kerry May it please the court, Daniel Kearney of Adams Kearney Law on behalf of Colleen M. Bradley plaintiff appellant in this matter. Your Honor, our position is that this case is a quintessential special value case under the First Amendment. We have a plaintiff who acquired information that was related to the subject matter of her employment. However, our position is that, and we believe that this has been admitted by defendants, that the actual speech in question was outside the scope of her ordinary duties. Let's start at a very basic point, and that is, what is the speech that is alleged to have been made and the basis for retaliation here? The alleged speech was made to a group of leaders. Is this the EMC meeting? Yes. In the chronology here, there were comments in September 2012 to the ABC committee, but that's several years back. So is it Ms. Bradley's comments and remarks at the EMC meeting on November 18th of 2014? That is correct, Your Honor. Is the speech that is at issue? Yes. And our position is that when questioned multiple times during this deposition, one of the defendants, Defendant Mixner, who is in essence the chief financial officer of Westchester University, who is also Ms. Bradley's direct supervisor, Mixner was the person who actually defined her duties at Westchester. And when asked in deposition, was it Ms. Bradley's, was it within her ordinary duties to report unethical conduct, to report misrepresentations in a budget, to actually present the information that she presented at the EMC meeting on October 29th, 2014, his answers were consistently no. I think we understand your essential theory here, although there may be a need to get into it further. But, of course, the defendants have thrown a few obstacles, if you will, in your way here. And perhaps as predicates, we need to address those. Specifically, the Pennsylvania state system here is contending that it has 11th Amendment unity. And I think you have suggested that our Miami opinion is something that, explain to me what it is you want us to do, that we need to reevaluate it, that it's still good law. So why is it not a guide to us here in terms of our analysis as to whether P-A-S-S-H-E, which I would prefer to refer to as the state system, is entitled to 11th Amendment unity? There are multiple reasons, Your Honor. And it begins with the Ski Inn decision itself, which took place in 1987. Pesci, at that time, was in existence for three or four years. It has a limited operating history. In connection with that case, Judge Adler, sir, did not have opportunity or didn't address, actually, the entities that are out there operating as part of the system. We used the nine Urbano factors in that case. Urbano factors, yes. And then we later boiled them down in a subsequent decision. Boiled them down. But we concluded that the state system was an arm of the state, entitled to immunity. What's changed? What's changed is actually when the boil down occurred, and possibly leading up to that, the function of the party was an important factor. And if you read Judge Adler, sir,'s opinion carefully, you'll see in the lead up to the opinion, or in the initial part of his opinion, he gives a lot of word share to the function of Pesci, and that it's traditionally providing public education as a government function. And some of that reasoning seeped into his examination of the funding analysis. So that, in and of itself, is a significant change. And I also think Maliandi commands that each entity that is being considered for immunity go through this detailed particular analysis. And that has never occurred, to our knowledge, with respect to Westchester University, whether at the district court level or at this court's level. They have never been exposed to that kind of scrutiny. And unless I'm reading Maliandi incorrectly, it says each entity. Westchester has separate existence. It's been separately incorporated for a long time. And the practical reality of Westchester's existence is such that even their CPAs look at what their practical reality is. They say they function independently, and Pesci is essentially a vehicle for them to take care of or to take the benefit of volume purchasing and things like that. So, in our view, funding has changed over the years when Judge Alderser issued his opinion. Is the funding factor even really at issue here? It may be. The strength of the funding factor may be at issue because the law remains that even though we view each factor... Is it a factor as to Westchester University? Yes. I thought both sides had agreed that the funding factor does not weigh in favor of the university here. I think that's right. Can I come back with respect to application of the fidget factors? Yes. The university isn't going to prevail on that, so that analysis comes down later to the other factors. Again, I think we're both skipping forward because I'm not sure how that relates to Pesci, but in any event, let's move on to the university because we also there have some analysis to do. If the funding factor does not weigh down to the benefit of the university in that analysis, we've got to focus on the status of the entity, right? Correct. And on the university's autonomy, right? Yes. Or lack thereof. What's your position on those two factors? My position is that the practical reality of Westchester University's autonomy has been very, very broad in practical terms. There are several examples of that. There's a requirement that they submit their budget annually to their council of trustees, who then in turn is supposed to submit it to Pesci. That requirement was ignored for 12 years, as long as defendant Mixner was in that position. So their budgets never really got any sort of supervisory review, other than its submission to Pesci, who in conspiracy with Westchester, directed them to essentially change the projected loss so that they could show across the board that Westchester had a deficit, when the actual reality was they were putting $20 million of cash in the bank every year. And then they eventually come up with a plan where their council of trustees authorizes a secession plan, and they engage their foundation to, in essence, promote, develop the executive officers of Westchester University. Their president was the major architect of a secession plan. And in essence, what are they seceding from? What are they seceding from? Unusual or what they view as overly burdensome restrictions. No, no, no. Not the reasons. What are they seceding from? They're seceding from their position as a commonwealth instrumentality. Which is a tacit admission that they are commonwealth. It's not a tacit admission. If they're not part of the commonwealth of Pennsylvania, then they can't secede from the commonwealth of Pennsylvania. They can be a quasi-private university, as opposed to what might be characterized as a state-funded, owned university through Pesci. Well, let me ask you this. In practice, the General Assembly apparently appropriates funds to both Westchester University and the state system. By simple majority vote. Does that violate the Pennsylvania Constitution? I don't believe so, your honor. You argue that members of the state system's board of governors and members of Westchester's council of trustees are not removable at will. What is the procedure for removing them? If it's not that, what is it? The procedure for removing them is to remove them only for cause under the Constitution. Otherwise, there is no procedure for removing them that I'm aware of. At will. Certainly the Constitution contemplates that they can be removed for a cause. In essence, once those council of trustee members are appointed to their positions, they are guaranteed a term of a certain number of years. The governor, to our knowledge, has no veto power. And when the secession plan, which I find extremely indignant to the Commonwealth, was proceeding through and the Senate bill was introduced by the trustee of Westchester, there was no legal action taken. And we haven't been able to find, and the defendants haven't been able to show us, where that right might evolve from. Mr. Kennedy, you've exceeded your time and we haven't even gotten into Mr. Mixner and the speech itself and your theory as to why that speech was not simply speech in connection with her employment. Let's return to that. You've reserved five minutes for rebuttal and we'll give you sufficient time to explore that area when you return. Thank you. Thank you, Your Honor. Mr. Knorr. May it please the Court. I'm John Knorr from the Pennsylvania Attorney General's Office and I represent the appellees in this case. If I could start by clarifying the relationship between the Eleventh Amendment issue and the First Amendment issue. If we win, as I think we should on the Eleventh Amendment issue, that does not dispose of the entire case because, of course, we have Mr. Mixner who has been sued for damages in his individual capacity. So either way, the Court will still need to reach the merits of the First Amendment issue. That's why I was careful to indicate to Mr. Kennedy that we wanted to still hear him on this subject. Sure. Let me start then with the Eleventh Amendment briefly. Our view is it's still in two still controls because the relationship of the state system to the commonwealth has not changed since then. So your position then would be that in Fitchett, when we were involved, we didn't overrule, we didn't supersede, we didn't really do anything other than to consolidate the Urbano factors and make them more workable within really three basic factors that had some subparts to it. That's correct. And that, by the way, is exactly how the Court characterized Fitchett in the Maliandi case. So there's been no change in the relationship between the state system and the commonwealth, and there has been no material change in Eleventh Amendment law. The major change has been the de-emphasis of the funding factor, which, of course, redounds to our benefit. So in our view, there has been nothing in the law or anything that has developed in the 30 years since Skian II that would lead to a different result. Now let's talk about the university itself. We think that it's all a unit. All the component universities of the state system are governed by the same statute. They're all under the control of the commonwealth one way or another. Who are the trustees and who appoints them? Okay, there's two bodies. Are you talking about just the university? I'm talking about the university. There's a thing called the Council of Trustees, and they are all appointed by the governor with the advice and consent of the Senate, except for a student member who is appointed by the governor without the advice and consent of the Senate. And in our view, they are all removable at will by the governor. My friend relies on a series of cases from the Pennsylvania court seat. Well, one of the cases he relies upon is Goldman v. SEPTA. Now, you want to distinguish that case and the governing body of SEPTA from what we have here? Sure. Goldman was a state Supreme Court case, but it did involve the 11th Amendment status of SEPTA, the local transportation agency here in Philadelphia, and the control there was quite different. In that case, it was, I believe, a 15-member board of whatever, only five members of which were appointed by the governor. The other members were appointed by the local county governments. So we did not have commonwealth control of the entity. In addition to that, the treatment of SEPTA under state law was quite equivocal. For some purposes, SEPTA was treated as if it were a state agency, but for most purposes, it was not. It was treated as a local agency. Here, in contrast, as far as I can determine, there is no provision of state law that treats the state system as anything other than a state agency, and my friend has not pointed to anything. So that's the basic distinction between this case and Goldman. Mr. Norris, let me ask you this. Is West Chester University subject to the procedural requirements of Pennsylvania's administrative agency law? Yes. Is West Chester subject to the commonwealth documents law? Yes. The Regulatory Review Act? Yes. Must West Chester's contracts be approved for formal legality by you, the State Attorney General, or the Governor's General Counsel? Yes, they must. Must West Chester adhere to the requirements of the procurement code? Up to a point. There are some provisions in which the state system is carved out. For example, they can act as their own purchasing agent rather than going through our Department of General Services. But in general, yes, they are subject to the procurement code. Thank you. Is West Chester subject to audits by the Auditor General of Pennsylvania? Yes. Thank you. Across the board, it is treated as a state agency. Unless the board has further questions, I would like to let you know. Let's go to Mixner and the actual speech itself from November 18th of 2014 and the commonwealth's position with respect to the nature of that speech. The comments at that committee meeting, Ms. Bradley's comments, in terms of the subject matter, concerned one of her core responsibilities as a budget director, preparing and presenting the budget. She was directed by her superiors to do that in front of this committee. All of her comments, of course, were made within her own organization to a committee that she had been directed to address on this very subject. And, of course, the comments were made using a channel of communication that was only available to her as a state employee, as a public employee. And given that constellation of factors, the district court, my friend and I, have not found a single case holding that speech under those circumstances was citizen speech. And all the case hold points in the other direction. Had she gone to the press, it would have been though, right? That would have been different. Under Doherty. It's not a Garcetti case. Yeah. I mean, unless you're a press spokesperson, speech to the press letters to the editor is quintessential citizen speech. It is a little strange, perhaps even inequitable, right? People who go up the chain of the command. Rules followers don't have a cause of action, but people who run to the media do. That's just the way it is under Garcetti, I guess. That is the way it is. Life's unfair. Mr. Carney has emphasized to you a series of questions that Mr. Mixner was asked at his position about her responsibilities. All of those questions are on page 519 of the record. I urge you to read them because they are all very broad. I'll read just one as an example. Garcetti has been mentioned here, which certainly is prominent in the area of these types of cases, instructs that job descriptions are not dispositive, but they can be looked to, can't they? I mean, they can be relevant. They're informative and they're relevant, but they're not dispositive. To what extent did her job description here map to what actually occurred, what she actually did in eventually making the remarks and engaging in the speech that is relied upon here? Her job description specifically provided that it was her job to prepare and present the budget to the Administrative Budget Committee, but also to other committees and other university leaders as directed. And that is exactly what she was doing. It's quite clear here that we have a rather dramatic difference between what Mr. Mixner  and what Ms. Bradley thought was proper and appropriate to submit as a budget. No one can, I think, contest that. What is unclear to me, though, is that despite this considerable difference of opinion, is there anything in the record suggesting what actually for budgeting or accounting purposes was the appropriate course? Is there anything that the district court looked to or that this panel could look to that suggests who was actually right or correct here, as opposed to the fact that there was simply a stark dispute over what was appropriate? Well, the short answer to that is no, Your Honor. Well, that's what I thought, because as a consequence then, all we have, if I understand the record correctly, is the fact of a dispute. And her suggestion, in fact, her use of the word corrupt, but how does this panel or how the district court know that she was right or wrong in that regard? It doesn't matter. I mean, we're at C. It doesn't matter. Who was right and who was wrong is matters to the taxpayers, probably. That may well be. But for the purposes of the First Amendment, for her to be right is not a necessary, a sufficient, or even a relevant condition. That was the Supreme Court's very point in Garcetti. When you're talking about employee speech, the employer has the right to control what is said. And if the employer, it's up to the employer to decide if that speech is well taken or not. And the Supreme Court thinks it's not. As Judge Hardiman has suggested with his question then, so long as this is contained within, and I don't mean to speak for him, but what I'm taking from all of this, including his question, so long as the speech occurred within what are her duties internally, and that this dispute over budgetary practices took place only within the confines of these employment relationships within the university and the university vis-a-vis the state system, they do not constitute speech that becomes actionable for retaliation purposes. Only once she goes outside does she take a step which, if retaliated against, gives rise to a First Amendment claim. Let me give a somewhat qualified answer to that. In the context of this case, that is exactly correct. That is exactly the holding of Garcetti. Now, there are cases where employees do have job responsibilities that require them to interact with people outside of their own organization. But that is a little bit different. This isn't even a forger situation, is it? I mean, we don't have an up-the-chain-of-command process here. I mean, this is an internal debate, as I understand the record. I think that's correct. Now, she did originally rely on some speech made up to her supervisors, but as I understand it, that's now been dropped out of the case. We're talking about her speech to this Enrollment Management Committee, which was not in her chain of command, but was a committee that she was directed to address in accordance with her usual job duties. If I can get back to Mr. Mixer's deposition, as I said, all the questions directed to him were very broad along the lines of, well, did she have a duty to report on ethical practices? And I submit to you that the Garcetti analysis can't be resolved at that level of abstraction. Maybe she didn't have some general duty to report, quote, wrongdoing, but when inaccuracies or wrongdoing arose in the context of the budget she was preparing, she sure did have a duty to do that, and that is exactly how she viewed her duties. We have her memorandum in the record. It is my responsibility to report data that I can support and explain. I am trying to perform my job with integrity and honesty. What if instead of having a dispute with Mixer about the budget, she expressed a concern about drug use? I'm sorry. What if she expressed a concern about drug use by the leadership at Westchester? Protected or not? I think that would be a very different analysis. I know that. Well, I can't draw bright lines for you, Judge Hartman, because that's not how this area goes. You would have to look at exactly what she said, to who she said it, in the context, and whether there was any relationship at all to her job responsibilities. If there are no further questions. No further questions. Thank you for your attention. Thank you. Thank you. Your Honors, I would first like to address a clarification point, and that is counsel just referenced that there was only one spot in the appendix that talks about what Ms. Bradley's ordinary duties are and defendant's response. There's actually a second spot, and that's at A472, plaintiff deposition page 52, in which Mr. Mixner responds to a very specific question, and that was, was it within Ms. Bradley's ordinary duties to present her version of the budget to the Enrollment Management Committee? And he says no, and he said it wasn't within her normal duties to do that. In fact, she actually contradicted instructions from him in doing so. In that instance, this is not Garcetti. Garcetti, we had a plaintiff who admitted that the memorandum that he prepared was part of his ordinary duties. In this case, Ms. Bradley had very little to gain by presenting that budget. She was presenting a fraud to a group of leaders outside the University of Westchester. Why is it relevant whether she has anything to gain? Garcetti had nothing to gain. The sobrios, the plaintiff in Garcetti, had nothing to gain. It comes to motive, actually. You have a lot to lose, in fact, when you're an internal whistleblower. Absolutely. Right. And sobrios was an internal whistleblower. Yes. And your client was an internal whistleblower. Yes. And the Supreme Court teaches in Garcetti v. Sobrios that internal whistleblowers have no cause of action. So how is this case different? I would especially disagree, Your Honor. That's not what Garcetti says. What Garcetti says is it doesn't matter whether that speech is made in the office or outside of the office. The critical question is whether the speech is within the or ordinarily within the scope of an employee's duties. Actually, some specific language is whether it's outside the course of their ordinary job responsibilities. Outside the course of ordinary job responsibilities. So we have a defendant here who is essentially agreeing that this was not one of Ms. Bradley's normal duties, ordinary duties, to make this speech. What are her ordinary duties then? Just to do whatever she's told? That's an interesting question because her duties changed over time. And when she was hired for the position, the understanding was that she would secede to Mixner's position as chief financial officer. Back in 2012, when she started complaining about arbitrary adjustments to turn profits or projected profits into duties. How can you say that it is not her ordinary job functions or within her ordinary job responsibilities? Inside the course of them. To submit what she believes to be correct, valid figures and budgetary requests. Why isn't that quintessentially what she's supposed to do in her role? There's a difference between having a disagreement over a budgetary practice versus exposing deliberate misrepresentations that happen to be housed in a budget over which she has responsibility. Here's a hypothetical. You have a person that's responsible for writing checks in a company. Her supervisor comes to her and says, I want a check for $100,000 made out to me. And the employee says, I can't do that. Well, why can't you do that? I'm entitled to it. Well, the employee suspects he's not entitled to it. If that employee goes to another supervisor and reports that misrepresentation or that misappropriation and gets fired because of it, that employee is speaking about a misrepresentation in the scope of their job, which is to write checks. Ms. Bradley became a budget clerk in September of 2012 when she spoke out against obvious arbitrary changes to budgets that didn't even come from within Westchester. They came from PASHE, who was doing this throughout the entire system. Any profitable university budget director was directed to show a deficit so that they could provide an overall budget to the state that would keep appropriations level. Ms. Bradley objected to that deliberate misrepresentation of numbers designed solely, which makes her admit in the minutes of a September 27th board meeting that the sole purpose of that change was to maintain appropriations. Lois Johnson directed him. He was the party ultimately responsible. And Ms. Bradley had the courage to step up and point out that this isn't a budgetary practice. This is misrepresentation. We can't do this. And everyone in that meeting agrees with her. But nobody has the courage to stand up against it. And it's not her function to expose misrepresentation. That seems to be the crux of the argument. It was not her function to correct. Correct. That was not her job. They had a separate internal audit position. And was it Tobias's function to expose fraudulent affidavits in the L.A. district attorney's office? It was within his function to write a memorandum that was commissioned by his employer, which he admitted. Let me ask you this last question, I guess. So in the case of Dahlia against Rodriguez, this court, does that case stand for the proposition that speech made it work, but outside the chain of command is always protected? I think it does, actually. And this circuit has not held that. Well, if that's so, let me quote from that case. Whether or not the employee confined his communications to this chain of command is a relevant, if not necessarily dispositive factor in determining whether he spoke pursuant to his official duties, end quote. So isn't the answer no? I thought the question was if they speak outside of their chain of command, is it automatically a violation? Let me answer it again. So Dahlia against Rodriguez, which you know, does it stand for the proposition that speech made at work, but outside the chain of command, is always protected? Isn't the answer to that question based on the quote from that Dahlia decision? I read you no. You gave me the answer is yes. But it's really no, isn't it? I think so. I think so, too. Thank you, Your Honor. Thank you very much. You, of course, exceeded the time, but we do that a lot around here. Thank you. Thank you very much. We'll take the case under advisement. We thank counsel for their arguments, and we're going to take a very brief recess.